## Detterline v. Rubino

*Fred T. Cadmus, 3rd,* for plaintiffs.

*Theodore O. Rogers,* County Solicitor, for defendants.

GAWTHROP, P. J., October 17, 1969.—Plaintiffs seek to enjoin defendants from carrying out the terms of a contract between the County of Chester, acting through a majority of its Board of County Commissioners, and Cole-Layer-Trumble Company, Inc., for reevaluation of all lands in the county for tax assessment purposes, to enjoin the county controller from paying out any moneys pursuant to said contract, to restrain the chief assessor and the Board of Assessment and Revision of Taxes of the county from taking any action pursuant to the contract, and for a determination that the contract is illegal, null and void. The

case was tried on complaint and answer which, with the evidence presented, raised two issues: (1) that the county was without legal authority to enter into the contract under the provisions of The Fourth to Eighth Class County Assessment Law of May 21, 1943, P. L. 571, as amended, 72 PS §5453.306, and (2) that defendant county commissioners by entering into the contract were guilty of capricious conduct or abuse of power in failing to investigate other superior methods of handling assessments, particularly in failing to make adequate investigation of the proposal of General Electric Company (GE) and in making no investigation of the method of Howze and Associates, Inc.

## FACTS

From the evidence adduced the facts are as follows:

Theodore S. A. Rubino, J. Carl Empie and Louis F. Waldmann entered upon their duties as Commissioners of Chester County on the first Monday of January 1968. Shortly thereafter, they agreed unanimously and still agree that a reevaluation of real estate for tax purposes is necessary. They further unanimously agreed and still agree that if such reevaluation cannot be done by the staff of the chief assessor of the county it should be done by a professional appraisal firm.

Messrs. Rubino and Empie asked both Christian Shank, the Chairman of the Board of Assessment and Revision of Taxes and Walter S. Pierce, chief assessor of the county for some five years before April 1, 1969, to determine whether the county staff could make the reevaluation. Mr. Shank expressed the opinion that they could not. Mr. Pierce advised them that all but six of the employes on his staff are clerical workers, and that those six persons, his field men who value all new construction, subdivisions and ad-

ditions to buildings, could not do more than they are already doing. Particularly, they could not reevaluate between 74,000 and 87,000 parcels of land in the county.

Mr. Empie was informed by a Commissioner of Lancaster County that Lancaster had tried unsuccessfully to reevaluate its real estate through the use of its own assessor's staff and that the program had become "so fouled up that they had to call in Cole-Layer and Trumble to straighten them out." Based on Messrs. Shank and Pierce's opinions, on the magnitude of the work involved, and the report of Lancaster County's experience; Messrs. Rubino and Empie were satisfied that the county assessor's staff could not and should not attempt to reevaluate all the properties in the county. Mr. Waldmann concurred in this view.

The previous reevaluation of real estate in this county in accordance with the requirements of the Fourth to Eighth Class County Assessment Act, was made by Cole-Layer-Trumble Company, Inc. (Cole) prior to 1960. That company has done such work for more than 30 counties in Pennsylvania, has a good reputation as an appraisal firm as is conceded by its competitor, James A. Howze, and is made up of persons of integrity and ability, as is acknowledged by Commissioner Waldmann.

Mr. Empie discussed with at least one commissioner of Bucks, Montgomery and Lancaster Counties Cole's charges and the degree of satisfaction with its work. C. Gilbert Hazlett, former Commissioner of Chester County for whom plaintiffs' counsel expressed high regard, recommended Cole to Mr. Empie, as did also members of the Pennsylvania Economy League and both the Chairman of the Board of Commissioners and the Chief Assessor of Montgomery County. The director of research of the National As-

sociation of Counties, in a letter to Commissioner Waldmann dated August 14, 1968, which was shown to Mr. Empie, referred to Cole as doing "a good job," stated that its charges of about $300,000 for the previous reevaluation were "a real bargain," and that presently the cost would be considerably more. That letter suggested as possible appraisers four other companies, two of which are in Pennsylvania and the other two, including Howze and Associates, Inc., are in Florida.

GE submitted a proposal of its computerized appraisal system and explained it in detail to the chief assessor and the Chairman of the Board of Assessment and Revision of Taxes, and later Dr. Kozik, who developed the system, went over it in detail with Messrs. Rubino and Empie. In addition GE's marketing representative went over the system in detail with Mr. Rubino. Mr. Waldman did not attend or participate in the discussions held with GE's representatives because he was unavailable and could not be reached to be in attendance.

GE's system had never yet been installed anywhere. It proposed establishment of a kind of "teamwork" operation which would use all existing data in the chief assessor's office and the services of the local municipalities and the county's assessors who would do the field work, coupled with GE's computer technology operating out of its home office, for establishment of "homogeneous" land or property values throughout the county in order to "determine a sample house which would become the home for the homogeneous value area." All "exceptional cases" would be flagged by the computer and "(i)f the exception was severe enough (GE) would have to do an eyeball inspection of that property." In many instances, it would be impossible to establish a model property, but in any event, GE would expect and ac-

cept a margin of error in the result of from three to five percent of the parcels appraised. In cases of appeals from assessments, GE would provide expert witnesses only as to the operation of the system. It would not provide expert real estate appraisers as witnesses in support of the appraisals.

GE's estimate of cost of installing its system was $500,000, and the estimated cost of maintaining the system for the first year was $80,000 to $160,000 and $80,000 yearly thereafter.

The county's data processing manager, Mr. Johnson, who was asked to analyze and make a recommendation concerning GE's proposal, calculated GE's annual charge for producing lists for tax duplicates and tax bills from its computer at $112,000. Based on his study of GE's proposal, a conference with Dr. Johnson of GE, the possibility that the system of using sample properties might be held inadequate on assessment appeals, the fact that the system had not yet been installed anywhere, a study comparing on the one hand the annual cost of maintaining the GE system, its use in preparation of tax duplicates and tax bills, the cost of computer rental and of hiring programmers and punch card operators with the cost of the present system on the other, Mr. Johnson recommended orally to Mr. Rubino in the summer of 1968, and by letter on November 20, 1968 to the board of commissioners, the county controller, solicitor and engineer, that GE's system not be installed. Both Mr. Johnson and the Board of Assessment and Revision were of the opinion that GE's system could not do the work satisfactorily and at the same time was more expensive than the work of Cole.

At the 1968 State Convention of County Commissioners held in Pittsburgh, Mr. Empie discussed reevaluation costs with all appraisal firms which had representatives present, and obtained and studied a

report of the League of Women Voters of Butler County which had made a survey of assessment costs and methods. He also considered all of the firms suggested in the August 13, 1968, letter from National Association of Counties to Mr. Waldmann and made telephone inquiries concerning them.

At a commissioners' meeting on July 11, 1968, a motion was adopted to bring in Cole to go over the matter of reassessment and to proceed with reassessment of the county as soon as Cole could be brought in to discuss the matter, and further that the board be authorized to employ an outside firm to reassess the county. The intent of that motion was only to confer and discuss the matter and not to employ Cole at that time, as is confirmed by a motion adopted at a commissioners' meeting held July 18, 1968, referring to the action taken on July 11th as exploratory only, and determining to investigate further the computer method of reevaluation. At the July 18th meeting Mr. Rubino stated that "the Board intends to investigate all firms qualified to do this reassessment and then select the one that will be the most inexpensive and the best qualified."

About September 1, 1968, Mr. Waldmann talked by telephone with James A. Howze, of Howze and Associates, Inc., Tampa, Fla., an appraisal firm using computer processes and one of the firms mentioned in the National Association's letter of August 13, 1968, shown to Mr. Empie. However, although shortly after September 1st he received correspondence and literature from Howze, Mr. Waldmann did not ask a Howze representative to come to West Chester until December 12, 1968, after the award of the contract to Cole on November 21, 1968.

During the week before November 21, 1968, Mr. Waldmann was present at a meeting of the commissioners with representatives of Cole and made no ob-

jection to employing Cole. He was also present on November 20, 1968, when Mr. Johnson reported to the commissioners in writing his recommendation against hiring GE and in favor of Cole. Messrs. Rubino and Empie had informed Mr. Waldmann of Cole's offer to make the reassessment for about $550,000 and the agenda for the commissioners' meeting of November 21, 1968, on which the matter of reevaluation was listed was prepared and available by noon on November 20th.

At some unspecified time before November 21, 1968, Mr. Waldmann had mentioned the Howze firm to Mr. Empie, but he does not recall whether he then had any detailed information about that firm. He did not press the matter further with either of his fellow commissioners and no representative of Howze communicated with either of them. Neither did he make further inquiries about or investigation of that firm or its appraisal system until after the board had awarded the contract to Cole. Not more than two weeks before November 21, 1968, Messrs. Rubino and Empie had reached the informal decision that Cole should be employed to make the reassessment. Mr. Waldmann first suggested to the board at the meeting held November 21, 1968, that the Howze firm be considered. Mr. Howze, representing his company, did not come to West Chester on Mr. Waldmann's invitation until January 1969 when he met privately with Mr. Waldmann "to talk to him generally." He did not meet or communicate with the other commissioners.

The Howze system is in operation in certain counties in Florida and Tennessee and is being installed in one county in North Carolina but nowhere north of those States. Its approach is to add replacement cost of buildings, less depreciation, to market value of land and to undertake to keep valuations current by use of a computer. Mr. Howze had not made and

could not give an estimate or opinion of the cost of installing his system in this county on the basis of the county's renting its own computer, nor of the annual cost of operating the Howze system on that basis. However, he estimated the cost of operating the Howze system on the basis of Howze itself handling all computer work and the county collecting and supplying all information to Howze to be fed into its computer, at from $1 to $2 per parcel of land, or as much as $148,000 per year on a basis of 74,000 parcels to be reassessed. According to Mr. Johnson's estimate, if Chester County were to maintain the Howze system, it would require renting a computer for about $8,000 per month, and a key punch machine at $70 per month. In addition, it would be necessary to employ two programmers with specialized training at about $15,000 per year each, as well as about 20 additional key punch operators. The rental cost to the county for maintaining its own computer and key punch machines, and the cost of necessary additional programmers and key punch operators would be substantially the same or more under the Howze system than for operation of the GE system.

Based on the investigation and study they had made, at a commissioners' meeting held November 21, 1968, Messrs. Rubino and Empie, over the opposition of Mr. Waldmann, adopted a motion to award to Cole a contract to reassess all real estate in the county. Mr. Rubino stated at that time the intention and purpose of maintaining in the chief assessor's office sufficient qualified personnel to keep current annually thereafter the assessments to be made by Cole.

At a commissioners' meeting held December 19, 1968, Mr. Waldmann reported that by letter of December 12, 1968, he had invited a representative of Howze and Associates to come to West Chester, ob-

tain the information necessary, make a study of the reassessment program and thereafter present Howze's reassessment proposal. Mr. Rubino pointed out the action of the board on November 21, 1968, awarding the contract to Cole and a motion to authorize execution of the contract with Cole, in the form presented at that meeting was adopted, Messrs. Rubino and Empie voting in favor of the motion and Mr. Waldmann opposed.

## DISCUSSION

The County Code of August 9, 1955, P. L. 323, sec. 202(4), 16 PS §202(4), expressly empowers counties to "(m)ake contracts for carrying into execution the laws relating to counties and for all lawful purposes," and section 203 of the code, 16 PS §203, provides that "(t)he corporate power of each county shall be vested in a board of county commissioners."

The Fourth to Eighth Class County Assessment Law of May 21, 1943, P. L. 571, art. VI, sec. 602, as amended, 72 PS §5453.602, requires the chief assessor of a county to "assess, rate and value all subjects and objects of local taxation . . . according to the actual value thereof." The duty thus imposed upon the chief assessor may be carried out by a contract entered into by the commissioners who, long before the Act of 1943, supra, have been authorized by law to do so: Pardee v. Schuylkill County, 276 Pa. 246. And valuations so arrived at may properly be adopted by the chief assessor and the Board of Assessment and Revision as their own. Cf. Hammermill Paper Company v. Erie, 372 Pa. 85, 95-96. But plaintiffs contend that, having once entered into a contract under sec. 306(b) of the Act of 1943, supra (72 PS §5453.306(b) ) for establishment of a permanent records system of assessments and having established that system, the county has exhausted its power to contract for reevaluation

or reassessment of lands in the county by an independent assessment firm.

In support of that position, they rely on a dictum from Ingham v. Dodds, 30 D. & C. 2d 310. Not only are the facts of that case clearly distinguishable, but the quotation relied on by these plaintiffs is neither decisional in that case nor necessary to a determination of the question there involved. Furthermore, the provisions of sec. 306(a) of the Act of 1943, 72 PS §5453.306(a), make it the duty of the Board of Assessment and Revision, inter alia, not only to establish a permanent records system but "to keep it current." Clearly, the subject matter of the contract here in question is *not the establishment* for a second time of a permanent records system but only a *reevaluation of lands* for the purpose of keeping current the valuations of the properties already a part of the permanent system, with necessary additions to or adjustments in regard to them. We are satisfied, in view of the complexities involved in evaluating lands in a rapidly developing area such as Chester County, that it was never the intention of the legislature to proscribe the necessary updating of land valuations by entering into contracts with professional appraisers to make reevaluations merely because a permanent records system had already been established, and we find no merit in plaintiffs' first contention.

To prevail on their second ground of attack, plaintiffs have a heavy burden to establish fraud, bad faith, capricious conduct or abuse of power on the part of defendant commissioners. In such cases, ". . . we start with the well-settled proposition that in the absence of bad faith, fraud, capricious conduct or abuse of power, courts will not interfere with the acts of governmental or administrative bodies involving the exercise of discretion. [Citations omitted.] The wisdom of such action or the details of the manner

adopted to carry them into effect are matters into which courts will not inquire": Eways v. Board of Road Supervisors, 422 Pa. 169, 171.

"The presumption is that the acts of executive officers are done for public good. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent that discretion has been abused": Barnes and Armbruster v. Scranton Poor District, 105 Pa. Superior Ct. 149, 151-52, reaffirmed in Mayer Brothers Construction Company v. Erie Parking Authority, 189 Pa. Superior Ct. 1, 6.

Under the facts, all three commissioners have always agreed that inequities in the present assessments require a reevaluation. Defendant commissioners and the board of assessment and revision, aided by the chief assessor and controller, faithfully investigated the available methods of reevaluation and the firms available to perform the work. There is no evidence whatever of fraud or bad faith in the awarding or execution of the contract with Cole, nor is there any evidence of capricious conduct or abuse of power in so doing. That Cole has a reputation for doing competent work wherever employed is clear and is acknowledged by Mr. Howze, its competitor, and Mr. Waldmann concedes that its personnel are persons of ability and integrity. Not only was Cole highly recommended by Mr. Hazlett, a predecessor commissioner, but by the Pennsylvania Economy League and a commissioner and the chief assessor of Montgomery County, as well as by its performance in some 30 other counties in Pennsylvania and its prior performance in Chester County. The cost of its services were both fair and reasonable and also favorable when compared with GE's proposal, and when compared later with those of Howze and Asso-

ciates, Inc., whose system would be at least as expensive, if not more so, than Cole's. Defendant commissioners also made inquiries concerning other appraisal firms brought to their attention, but plaintiffs' attack here is almost entirely directed at the determination not to employ GE and a failure to investigate further the Howze system.

It early became obvious that the reevaluation could not be made by the county's existing staff in the chief assessor's office, although the need for reevaluation was evident. Legal authority for employing professional appraisers for the purpose existed which Commissioner Waldmann by his conduct both acknowledged and sought to exercise. The sole area of disagreement among the commissioners involved the identity of the firm and the nature of the system to be employed in order to establish values which could be kept current annually, either by the chief assessor's staff alone or by use of some computerized system, with or without the aid of that staff. Careful analysis made of GE's proposal demonstrated: (1) that it would involve great expense of installation and heavy annual expense of operation and maintenance; (2) that it was based upon the legally doubtful principle of establishing model homes and areas; (3) that it conceded a margin of error up to five percent of the properties evaluated; (4) that on assessment appeals GE would not provide appraisers who would support the valuations established, and (5) that it had never yet been installed anywhere so that the county would be a "guinea pig" for its initial tryout.

The Howze system, when first brought to defendant commissioners' attention in early September 1968, was in use only in a few localities in the southern United States, had undergone several revisions since it was initially installed without computers in 1962,

and since then has involved computerized methods as did GE's proposed system. Neither Mr. Waldmann nor anyone else prior to the award of the contract to Cole on November 21, 1968, or its execution in December 1968, apprised defendant commissioners of the details of the Howze system or the expense of installing or maintaining it. However, they had already investigated fully GE's proposal of a computerized system and found it unacceptable as well as unreasonably expensive. By reason of their general investigation and particularly their study and analysis of GE's computerized system, they were not guilty of capricious conduct or abuse of power and, clearly, were free from fraud and bad faith in not investigating further the Howze system. But had they had before them before November 21, 1968, the evidence as to the Howze system which was developed at trial, the correctness of their action in awarding the contract to Cole would have been the more apparent because: (1) at trial, Mr. Howze was unable to estimate the cost of installation of his system in this county, (2) his estimate of cost of operation of his system if Howze used its own computer was as much as $2 per parcel of land, or $148,000 annually, for the minimum of 74,000 parcels, (3) he could not estimate the cost of operation of his system if the county rented its own computer but Mr. Johnson's estimate thereof was at least equivalent to or more than that for GE's system, and (4) in final analysis, the Howze system's approach of adding reproduction cost of buildings, less depreciation, to market value of land is fatally defective as a matter of law and unacceptable because it would not support the valuations so made. In United States Steel Corporation v. Board of Assessment and Revision of Taxes, 422 Pa. 463, at 467 it was said: "We have held that, within the meaning of statutes of this nature, the term 'actual value' refers to market value

[Citations omitted] . . . Accordingly, the attempt on the part of Steel to apply depreciated reproduction cost as the value-fixing standard must fail. As we indicated in both Baldwin Lima and Buhl Foundation, supra, and on numerous other occasions, *reproduction cost has no probative value for any purpose* in fixing the fair market value of improved real estate for tax purposes." (Italics supplied.)

It is, therefore, clear to us, and we hold, that defendant commissioners were authorized by law to enter into the contract with Cole, that the contract is legally valid, and that plaintiffs, having failed to carry their burden of proving bad faith, fraud, capricious conduct or abuse of power by defendant commissioners, are not entitled to the relief they seek.

## CONCLUSIONS OF LAW

1. The contract entered into between the County of Chester, acting through Commissioners Rubino and Empie, with Cole-Layer-Trumble Company, Inc., is legally valid.

2. Commissioners Rubino and Empie were not guilty of bad faith, fraud, capricious conduct or abuse of power in entering into and executing said contract on behalf of the county.

3. The relief prayed for should be denied and the complaint should be dismissed.

The following upon praecipe will be entered as a final decree unless exceptions are filed within 20 days after notice of filing this adjudication.

## DECREE NISI

And now, October 17, 1969, this matter having been heard and considered, it is ordered, adjudged and decreed that

1. The relief prayed for is denied and the complaint is dismissed.

2. Plaintiffs will pay the costs.